UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IMMIGRATION SERVICES AND LEGAL ADVOCACY,<br><br>*Plaintiff*,<br><br>v.<br><br>ELIZABETH MURRILL, in her official capacity as Attorney General of the State of Louisiana, *et al.*,<br><br>*Defendants*. | Case No. 2:25-cv-02421<br>Judge Nannette Jolivette Brown<br>Magistrate Judge Michael North |

**MEMORANDUM IN SUPPORT OF MOTION FOR**
**EX PARTE TEMPORARY RESTRAINING ORDER**

Plaintiff Immigration Services and Legal Advocacy ("ISLA," "Plaintiff," the "Nonprofit") moves this Court for a Temporary Restraining Order ("TRO"). ISLA asks this Court to prevent Defendants from infringing on its First Amendment right to free speech. In particular, should the Court grant this Motion, Plaintiff plans to engage in core protected speech, namely, giving Know Your Rights presentations and trainings ("KYRs") to allies and members of the New Orleans immigrant community. In the wake of "Operation Catahoula Crunch"—the moniker for the federal government's operation targeting the immigrant community in the greater New Orleans area, which has also been dubbed "Operation Swamp Sweep"[1] (hereafter, "Operation Swamp Sweep" or "the Operation")—Plaintiff's KYRs are, on their face, imperiled by Defendants' threatened

---

[1] On December 3, 2025, the Department of Homeland Security announced that their operations in and around New Orleans would be dubbed the "Catahoula Crunch." The Catahoula is the state dog of Louisiana, and has been historically used as a hunting dog. Marco Cartolano, *Why is Border Patrol's New Orleans operation called 'Catahoula Crunch'? Here's what we know,* Times-Picayune (Dec. 3, 2025), https://www.nola.com/news/catahoula-crunch-new-orleans-immigration/article_fd5c8042-fdad-4e36-b7b3-090aa0fd991b.html.

enforcement of the language newly added by Act 399: La. R.S. 130.1(A)(6). Plaintiff thus asks this Court to enjoin Defendants from prosecuting, arresting, imprisoning, and fining Plaintiff and its agents for providing KYRs during the pendency of the Operation.

## INTRODUCTION

Operation Swamp Sweep, which began this morning, stands to infringe on the rights of the immigrant community and its allies. Compl. ¶6. Those individuals are predictably clamoring for KYR information, presentations, and trainings forthwith. *Id.* ¶9. But the premier Nonprofit on which many of them rely for such information went silent when they were most needed, on the very day journalists broke the story that the Operation was headed to New Orleans. *Id.* ¶13. The culprit: La. R.S. 130.1(A)(6), newly added language to the Obstruction of Justice Statute that puts people who "knowingly" engage in "*any* act" that may "hinder," "delay," "interfere with," or "thwart" "federal immigration enforcement *efforts*" in the law's crosshairs. *Id.* ¶15.

ISLA's speech has been chilled by La. R.S. 130.1(A)(6) because the law could (and likely will) be wielded against the Nonprofit and its agents if they inform the community about laws that restrict Immigration and Customs Enforcement ("ICE") arrests—including, for example, demanding a judicial warrant when ICE requests entry into a home. *Id.* ¶17. ISLA's fear is not an idle one, despite the fact that such speech (providing KYRs specifically) is wholly protected by the First Amendment. *Id.* ¶104. Previously, while serving as Solicitor General of Louisiana, Defendant Murrill served a non-party subpoena on the Nonprofit requesting, among other documents, all those "provide(d) to aliens . . . regarding public education," and those "used or presented by [ISLA] in any workshop or presentation regarding asylum since August 20, 2021[.]"[2]

---

[2] *See* Declaration of William P. Quigley In Support of the Nonprofit Organizations' Motion to Quash at 50, *Arizona v. Garland,* No. 22-cv-1130 (W.D. La. Mar. 20, 2023), ECF No. 122-2. The subpoena was later deemed moot. *Id.*

2

*Id*. To defend itself, ISLA was forced to acquire counsel.[3] Days after ISLA stopped providing KYRs to the community, Defendant Murrill, now Attorney General of Louisiana, issued broad and vague prosecution threats concerning her ability to wield Act 399 against those who oppose Operation Swamp Sweep. Compl. ¶11. Her statements were the nail in the proverbial coffin for ISLA's speech. *Id.* ¶19.

But ISLA cannot remain silent when people's legal rights are on the line. *Id.* ¶40. Because the Operation has now begun, the immigrant community now needs to know their rights more than ever. *Id.* ¶57. Without this information, they may not know how to legally resist unlawful acts by ICE, including but not limited to warrantless arrests. *Id.* ¶17. In light of this grave community need, ISLA asks this Court to immediately secure its First Amendment right to provide KYRs to the immigrant community and allies whose rights are currently and likely to be jeopardized by Operation Swamp Sweep. *Id.* ¶21.

ISLA seeks a TRO enjoining La. R.S. 130.1(A)(6) as applied to the Nonprofit's provision of KYRs. Plaintiff has pled and alleges that La. R.S. 130.1(A)(6) is overly broad, vague, and discriminates based on the content and viewpoint of particular speech. As such, it is unconstitutional as applied to ISLA's now-chilled KYRs. *Id.* at ¶114. Granting ISLA's TRO would protect its First Amendment right to free speech and allow it to conduct KYRs during the pendency of Operation Swamp Sweep and, as an initial matter, for the next fourteen (14) days.

## ARGUMENT

Under the Federal Rules, "a court may issue a temporary restraining order without notice only if: (a) specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard

---

[3] Minutes of Court: Motions Hearing/Status Conference, *Arizona v. Garland*, No. 22-cv-1130 (W.D. La. May 24, 2023), ECF No. 170.

3

in opposition; and (b) the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required." *Yogaratnam v. Dubois*, No. CV 24-393, 2024 WL 758387, at *2 (E.D. La. Feb. 23, 2024). This requirement has been met. *See* Verified Complaint, Dkt. 1 (showing irreparable injury as a result of chilled speech and explaining how this qualifies as an injury-in-fact, *id.* ¶¶ 68-69); Ex. A (November 28, 2025 Letter to Defendants and others explaining why newly added language to Act 399 is unconstitutional and concerns that it will accordingly be used unlawfully during Operation Swamp Sweep). A copy of the Verified Complaint will be personally served on Defendants within three business days of the issuance of summons.

Moreover, a plaintiff seeking a TRO "must additionally establish the following essential elements: (1) a substantial likelihood of success on the merits; (2) a substantial threat that failure to grant the injunction will result in irreparable injury; (3) the threatened injury outweighs any damage that the injunction will cause to the adverse party; and (4) the injunction will not do disservice to the public interest." *Id.* The Fifth Circuit requires only a "substantial threat" of irreparable injury, *DSC Commc'ns Corp. v. DGI Techs., Inc.*, 81 F.3d 597, 600 (5th Cir.1996), which is defined as "harm for which there is no adequate remedy at law," unlike, for example, monetary damages, *id.* The Fifth Circuit further recognizes that "[c]hilling a plaintiff's speech is a constitutional harm adequate to satisfy the injury-in-fact requirement." *Speech First, Inc. v. Fenves*, 979 F.3d 319, 330–31 (5th Cir. 2020), *as revised* (Oct. 30, 2020).

### I.   ISLA States a Viable Claim That La. R.S. 130.1(A)(6) Is Unconstitutional As Applied to Know Your Rights Information, Presentations, and Trainings.

ISLA seeks to engage in wholly protected speech by providing KYR information, presentations, and trainings to members of the New Orleans community. But ISLA has stopped doing so because its agents risk prosecution, arrest, imprisonment, and fines. Newly added

4

language to Louisiana's Obstruction of Justice Statute, La. R. S. 130.1(A)(6), appears, at face value, to criminalize the provision of KYR information to the immigrant community. In particular, the law threatens stiff monetary fines and imprisonment for "[knowingly] commit[ing] *any* act intended to *hinder*, delay, prevent, or otherwise *interfere with* or *thwart* federal immigration enforcement *efforts*." La. R.S. 14:130.1(A)(6) (emphasis added). The emphasized terms are so capacious they could mean almost anything. Specifically, these terms appear to proscribe KYRs that advise immigrants of their right to demand a judicial (as opposed to administrative) warrant before opening the door of their home to ICE personnel. Compl. at ¶4. Under the law, which includes no limits or exceptions,[4] providing such information could be deemed "knowing[]" "interfer[ence] with," or the "thwarting" of, or "hinder[ing]" "federal immigration enforcement efforts." *Id.* ¶15.

But ISLA's KYRs, which are currently chilled, are core protected speech. Because La. R.S. 130.1(a)(6) constitutes a restriction on protected speech, it (1) must be narrowly tailored to serve a significant government interest, leaving open ample alternative channels of communication; (2) cannot discriminate based on the content of the speech; and (3) cannot discriminate based on the viewpoint of the speaker. *United States v. Grace*, 461 U.S. 171, 179, (1983). None of these requirements are satisfied.

*First*, the law is not narrowly tailored, as it sweeps in a substantial amount of protected speech relative to any unlawful acts it may prohibit. *See Moore v. Brown*, 868 F.3d 398, 404 (5th Cir. 2017) ("[I]f a substantial portion of the burden on speech does not advance the goals of the

---

[4] Whatever the police power of the legislature, it is essential that it provide fair notice of what conduct is or is not proscribed. For example, La. R.S. 14:103, Louisiana's Disturbing the Peace statute, is constructed to provide notice that it proscribes, *e.g.*, the "[i]nterruption of any lawful assembly of people." La. R.S. 14:103 (A)(6). But even that statute has been historically limited by the United States Supreme Court and the Louisiana Supreme Court, because of the "plain requirement for laws and regulations to be drawn so as to give citizens fair warning as to what is illegal[.]" *Cox v. State of La.*, 379 U.S. 559, 574 (1965); *see also Garner v. State of La.*, 368 U.S. 157, 174 (1961).

5

rule, the rule is not narrowly tailored"). The right to challenge police activity—including by alerting people subject to that activity of their rights under the law—is at the heart of what the First Amendment protects. *City of Houston, Tex. v. Hill,* 482 U.S. 451, 462–63 (1987). Applying the statute to KYR presentations, as implied by Defendant Murrill's generalized threat to use Act 399 broadly and seemingly without restriction, violates the First Amendment. Compl. at ¶88. La. R.S. 14:130.1(A)(6)'s expansive language—covering any speech that "knowingly" "hinders," "interferes with," or "thwarts" "federal immigration enforcement efforts"—leaves open no alternative channels to allow ISLA to engage in KYR presentations and trainings. *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 45 (1983).

*Second,* the law is not content-neutral, as it discriminates against speech acts on the basis of their content, triggering strict scrutiny. Put another way, applying the law to ISLA would be unconstitutional because the *content* of the KYRs advise the public on rights that might "**hinder**, **delay**, prevent, **or otherwise interfere with or thwart**" "federal immigration enforcement **efforts**." *Cf. Reed* 576 U.S. at 163–64 (2015); Compl. at ¶77. Content-based speech discrimination is often "subtle, defining regulated speech by its function or purpose. Both are distinctions drawn based on the message a speaker conveys, and, therefore, are subject to strict scrutiny." *Id.* "Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Id.* at 163. But, as noted above, La. R.S. 14.130.1(A)(6) is not narrowly tailored. As such, ISLA is likely to succeed in showing that the newly-added language in Act 399 constitutes impermissible content discrimination in violation of the First Amendment.

*Finally*, La. R.S. 14:130.1(A)(6) constitutes viewpoint discrimination, independently rendering it unconstitutional under a strict scrutiny analysis. The practical application of the law

would censor any viewpoint that could be construed as "knowingly" "hindering," "interfering with" or "thwarting" "federal immigration enforcement efforts." La. R.S. 14:130.1(a)(6). These terms make it clear that speech of a certain viewpoint—specifically, against "federal immigration enforcement efforts"—is a necessary target of the law. Indeed, it worked to do so as applied to ISLA, which has stopped providing KYRs in the face of the law and Defendant Murrill's threats that it will be used as soon as Operation Swamp Sweep begins. Compl. at ¶5. ISLA stopped providing KYRs because it feared they would be deemed to "hinder," "interfere with," or "thwart" "federal immigration enforcement efforts," and subject its agents to prosecution, arrest, imprisonment, and fines. *Id.* at ¶15. While the law leaves ISLA "free to praise [federal immigration enforcement efforts, it] can send [ISLA. . .] to prison for opposing it, [which] cannot survive in a country which has the First Amendment." *Schacht v. United States*, 398 U.S. 58, 63 (1970). When a law demonstrates "an attempt to give one side of a debatable public question an advantage in expressing its views to the people, the First Amendment is plainly offended." *First Nat. Bank of Bos. v. Bellotti*, 435 U.S. 765, 785–86 (1978). Accordingly, La. R.S. 14:130.1(A)(6) fails strict scrutiny and ISLA has stated a viable claim under the First Amendment.

## II. Plaintiff Will Suffer Irreparable Harm in the Absence of Injunctive Relief.

Because Plaintiff ISLA shows an ongoing constitutional violation that is likely to continue, Plaintiff succeeds on the irreparable harm prong. "Perhaps the single most important prerequisite for the issuance of a [TRO] is a demonstration that if it is not granted the applicant is likely to suffer irreparable harm before a decision on the merits can be rendered." *Monumental Task Comm., Inc. v. Foxx*, 157 F. Supp. 3d 573, 582–83 (E.D. La. 2016). The loss of constitutional freedoms, particularly "[t]he loss of First Amendment freedoms, for *even minimal periods of time*, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373, (1976)

(emphasis added); *see also Kostak v. Trump,* 2025 WL 2472136, at *3 (applying *Elrod* to due process). Here, Plaintiff's fear of engaging in speech is sufficient for standing purposes because "[c]hilling a plaintiff's speech is a constitutional harm adequate to satisfy the injury-in-fact requirement." *Speech First, Inc. v. Fenves*, 979 F.3d 319, 330–31 (5th Cir. 2020), *as revised* (Oct. 30, 2020). Plaintiff has thus satisfied the irreparable harm prong.

### III. The Threated Injury Outweighs Any Harm to Defendants, and Injunctive Relief Serves the Public Interest.

The third and fourth prongs for granting a TRO militate in Plaintiff's favor. Where, as here, the government is a party to the case, the third and fourth factors of the injunctive relief test merge: the balance of the equities and the public interest. *Nken v. Holder*, 556 U.S. 418, 435 (2009); *El Paso Cty., Texas v. Trump*, 407 F. Supp. 3d 655, 665 (W.D. Tex. 2019). The balance of the equities here—between the imminent unconstitutional infringement on free speech rights and compliance with the Constitution—tips sharply in ISLA's favor. Granting the TRO would simply protect ISLA's rights to engage in protected speech and prevent potential unlawful prosecution under La. R.S. 14:130.1(A)(6).[5] Granting the TRO would also serve the public interest in that "it will require the Government to ensure compliance with its own laws." *Id*. Plaintiff has accordingly satisfied the final factors for injunctive relief to be granted.

### IV. The Court Need Not Require Security for the Temporary Restraining Order.

"The amount of security required pursuant to Rule 65(c) is a matter of discretion of the trial court, and a court may elect to require no security at all." *O.E. v. New Orleans Region Transit Auth.*, 2024 WL 2208716, at *10 (E.D. La. May 16, 2024). Because Defendants will not incur any

---

[5] To the extent Defendants have public safety concerns or seek to regulate non-expressive conduct during the pendency of the TRO, laws for the maintenance of public order remain in force and would be unaffected. *See, e.g.*, Obstruction of Public Passages (La. R.S. 14:100.1). The conclusion that can be drawn is that the existing laws in the Revised Statutes are sufficient for Defendants to maintain law and order as the legality of the newly added language to Act 399, at issue in this lawsuit, is litigated.

costs or damages if the requested relief is granted, beyond the monetary cost of performing their constitutional duties, Plaintiff asks the Court to not require ISLA to post security.

## CONCLUSION

Plaintiff ISLA asks this Court to grant a TRO enjoining Defendants from enforcing La. R.S. 14:130.1(A)(6) against them for the next fourteen (14) days, to afford them the opportunity to engage in protected speech acts and to allow Plaintiff and Defendants the opportunity to brief the issues at bar in the Verified Complaint further .

Respectfully submitted,

*/s/ Charles Andrew Perry*
*/s/Nora Ahmed\**
ACLU Foundation of Louisiana
Charles Andrew Perry
LA Bar No. 40906
Nora Ahmed*
NY Bar No. 5092374
1340 Poydras St., Ste. 2160
New Orleans, LA 70112
Tel: (504) 250-4879
(504) 522-0628
aperry@laaclu.org
nahmed@laaclu.org
*Pro hac vice application pending*